## Alcorn v. Adams Express Company.

(Decided May 14, 1912.)

### Appeal from Estill Circuit Court.

1. Carriers—In Forwarding Goods, Initial Carrier Agent of Connecting Carrier—Contract.—In forwarding goods over its connecting lines, the initial carrier is the agent of the connecting carrier; so the connecting carrier is, in every instance, bound by the contract made by the initial carrier with the consignor.

2. Carriers—Shipment of Corpse—Delivery to Connecting Carrier—Plea of Want of Knowledge of Contract.—Alcorn, while in the service of the United States Army died, and by an arrangement with the representatives of the Government, the Wells Fargo Express Company undertook the delivery of his body to his family in Kentucky, the charges to be paid by the Government. At Cincinnati the corpse was delivered by the Wells Fargo Company to appellee and the latter transported the body to a station in Estill County but refused to deliver it until the charges were paid. In an action against it by the father for damages, it pleaded that it did not know of the contract made with the initial carrier and that it paid the charges of the initial carrier and added its own charges to that account, and that in holding the corpse it acted under the direction of the initial carrier. Held, The court erred in peremptorily instructing the jury to find for defendant upon the last trial. It likewise erred in setting aside the verdict for the plaintiff upon the first and second trials, for the defense interposed by the defendant upon neither trial was good upon demurrer. In admitting a breach of the contract of shipment, the only question is the amount of damages to which the plaintiff is entitled.

CLARENCE MILLER, GREENE & VANWINKLE for appellant.

RIDDELL & FRIEND, LAWRENCE MAXWELL and JOSEPH S. GRAYDON for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

John D. Alcorn, while in the service of the United States Army in the Philippine Islands, died, and the Government caused his body to be returned to his parents, living at Rice Station, Estill county, Kentucky. His body was delivered to the Wells Fargo & Co. express, at San Francisco, and transported by it to Cincinnati, Ohio, and there delivered by the Wells Fargo & Co. Express to the Adams Express Co. for shipment to its destination, where it arrived about the 26th day of August, 1908, and was held for several hours by the

agent of said company, who refused to give it up to the parents of decedent because the express charges thereon, amounting to $138, had not been paid.

It appears that, at the time the body was delivered to the Wells Fargo & Co. Express by the representatives of the Government, an arrangement was made whereby all charges were to be paid by the Government; but, through some misunderstanding, error or oversight on the part of the Wells Fargo & Co. Express, the terms of this arrangement as to the payment of the express charges were not communicated to the Adams Express Company, and because of this fact the agent refused to deliver the body of decedent to his parents for some hours and until he had ascertained that it was not to be held until the charges were paid.

Alleging that he had been caused to suffer great mental pain and anguish by reason of this conduct on the part of the agents of the Adams Express Co., A. C. Alcorn, father of decedent, instituted a suit in the Estill Circuit Court against the Adams Express Co., in which he sought to recover damages in the sum of $1,025. The company in its answer denied liability and pleaded, in justification of its conduct, the following facts: On the 23d day of August 1908, it received at Cincinnati, Ohio, from the Wells Fargo & Co. Express, a shipment, purporting to be a corpse, with written instructions from said Wells Fargo & Co. Express, to transport same to Rice Station, Ky., and to collect on delivery thereof the sum of $127 charges for said Wells Fargo & Co. express; that it thereupon advanced and paid to said Wells Fargo and Co. Express the sum of $127 and added same to its own charges for transportation of said corpse from Cincinnati, Ohio, to Rice Station, Ky.; that when said corpse was received it did not know that he had been shipped under a contract with the War Department, or that the charges were to be paid by the Government; that under the written directions and instructions received in the form of a way bill and transfer sheet from the Wells Fargo & Co. Express, at the time the corpse was delivered to it, it was instructed and directed to collect of the plaintiff, the consignee, the said $127 before delivering the corpse to him, and that, in holding the corpse for the length of time it did and demanding payment of the charges, as stated, it acted only under and in accordance with the written direction of the Wells Fargo & Co. Express.

Upon the issue thus formed a trial was had, which resulted in a verdict in favor of. plaintiff for $500. A motion and grounds for a new trial were promptly filed and, upon consideration, the motion was sustained and the verdict set aside. A second trial was had, which resulted in a verdict in favor of plaintiff for $800, and this verdict was likewise, upon motion, set aside. A third trial was entered upon and, at the conclusion of all of the evidence, the court instructed the jury peremptorily to find for the defendant, which was done. The petition was dismissed and the plaintiff appeals and seeks to have the ruling of the trial judge, in sustaining the motion of defendant for a new trial after the rendition of the first and second verdict, set aside and the case reversed, with directions to enter a judgment upon the first verdict. Or, if for any reason that could not be done, that judgment be directed entered upon the second verdict. Or, if it should be held that he is not entitled to this relief, that the case be reversed because of error on the part of the trial judge in giving to the jury the peremptory instruction upon the first trial to find for the defendant.

It clearly appears in the evidence that, when the agent of the Wells Fargo & Co. Express, at Cincinnati, delivered the corpse to the Adams Express Co. it was not accompanied by the contract which the Wells Fargo & Co. Express had made with the representative of the Government in San Francisco, and it is apparent that the Cincinnati agent of the Wells Fargo & Co. Express did not know of the existence of this contract, else he would not have exacted of the Adams Express Co. the prepayment of its charges, amounting to $127 before delivering the corpse to the Adams Express Co. and the trial court was of opinion that, inasmuch as the Adams Express Co. knew nothing of the contract which had been made by the Wells Fargo & Co. Express, it was not bound by such contract, but must be considered as having made and entered into a new and different contract with the Wells Fargo & Co. Express, for the forwarding of the body from Cincinnati to its destination, from that which had been made by the Wells Fargo & Co. Express, with the Government, and that, in making this new contract with the Adams Express Co. the Wells Fargo & Co. Express acted as the agent of the consignor. He was doubtless influenced in reaching this decision by the text in Hutchison on Carriers, 3 Ed., Sec. 139,

where the author, in dealing with a state of facts similar to that under consideration, says:

"When goods are delivered to the carrier for the purpose of being carried to a point beyond the terminus of its route, and for that purpose to be delivered by him to a connecting carrier in order to continue the carriage, or where it becomes necessary for that purpose to make successive deliveries from one to another upon a continuous line or succession of carriers, the first and each succeeding carrier becomes the agent of the owner of the goods to make delivery to the next carrier; and it is incumbent upon him to do so not only to relieve himself from further liability, but because it is a duty which he owes to the owner, and which he has assumed with the acceptance of the goods. He is the party in charge of them, and the only one with whom the succeeding carrier can make the necessary arrangements, and stands toward them for this purpose in the position of an owner."

The court in Briggs v. Railroad, 6 Allen, 246, 249; Hayman v. Canadian Pacific Railway Co., 86 N. Y. Supp., 728; Patten v. Union Pacific Railway Co., 29 Fed., 590, and Whitney v. Beckford, 105 Mass., 271, seems to have adopted this view and held that, where the initial carrier, in forwarding the goods, made a contract with the connecting carrier different from that which it had made with the consignor, or merely delivered the goods to the connecting carrier without giving it notice of any special contract which it had made with the consignor, in such cases the initial carrier was acting as agent for the consignor; and that, where the goods were shipped over a connecting line under an arrangement different from that specified in the contract with the initial carrier, the consignor was bound by such contract as the initial carrier might make with the connecting carrier; or, where the goods were delivered to the connecting carrier without instructions or notice of any special contract of carriage, the connecting carrier might charge the usual and customary charges for the shipment. It will, therefore, be seen that these cases are bottomed upon the idea that, in forwarding the goods over a connecting line, the initial carrier acts as agent of the consignor.

We have not adopted that rule. On the contrary this court has held in the case of P., C., C. & St. L. R. R. Co. v. Viers, etc., 113 Ky. 526; I. C. R. R. Co. v. Curry,

127 Ky., 643, and in the case of B. & O. S. W. R. R. Co.
v. Clift, 142 Ky., 513, that in forwarding the goods over
its connecting lines the initial carrier is the agent of the
connecting carrier; so that the connecting carrier is, in
every instance, bound by the contract made by the ini-
tial carrier with the consignor.   This rule is too well
settled by the decisions of this court to admit of argu-
ment, although we recognize, as stated, that a different
rule obtains in some other jurisdictions.   The initial car-
rier being the agent of the connecting carrier with au-
·thority to represent it, the connecting carrier, in receiv-
ing the goods from the initial carrier, is bound by the
acts of the initial carrier, and will not be heard to say
that the contract of carriage is different from that made
by the initial carrier.   In other words, the connecting
carrier can not shelter behind a lack of knowledge as to
the contract which was made by its agent, the initial
carrier, and the fact that it has failed to inform itself
as to what contract was made for its benefit by the ini-
tial carrier is no defense to its breach.   This is neces-
sarily so if the initial carrier, in forwarding the ship-
ment, is to be treated as the agent of the connecting
carrier.

While such a construction may seem, at first impres-
sion, to impose a hardship upon the connecting carrier,
it is in fact more apparent than real, for it is well known
that all carriers have a trade arrangement or agreement
covering the transportation of goods over each other's
lines, and each can readily acquaint itself with the terms
upon which any particular shipment is made.   Where
the initial carrier obligates itself to transport the goods
to a point beyond its lines, it necessarily takes into ac-
count the carrying charges of the connecting line over
which it will have to pass, and the connecting line, in
receiving the freight from the initial carrier, is bound
to know that it is being transported under a contract of
some character, and it is entitled to demand and know
in advance of receiving such shipment the terms of the
contract under which it is being shipped.   If it fails to
exercise this right and inform itself of the terms under
which the goods are being shipped and, lacking such in-
formation, violates the contract of shipment, it is as
much liable for such breach as though it had done so
with full knowledge of the contract.

The court erred in peremptorily instructing the jury
to find for the defendant upon the last trial.   He like-

wise erred in setting aside the verdict upon both the first and second trials, for the defense interposed by the defendant upon neither trial was good upon demurrer. The only question was the amount of damages to which the plaintiff was entitled for having admitted that it transported the corpse and refused to deliver it up to the consignee when it reached its destination, appellee admitted a breach of the contract of shipment.

Upon the first trial the instructions were more favorable to appellee than they should have been. The evidence complained of was not prejudicial, for, in permitting the plaintiff to show that the telegraph agent at Rice Station was also the express agent, and that a telegram had been received by the telegraph agent some days in advance of the arrival of the corpse notifying the consignee that the corpse would be forwarded and all expenses for its shipment paid by the Government, the plaintiff was but proving the terms of the contract made by the initial carrier; and, inasmuch as we hold that the connecting carrier is bound by the terms of that contract, whether actually known to the appellee or not, this evidence was not prejudicial.

The first verdict was for $500. This seems large, but it is difficult to measure the extent of a man's humiliation and mortification in being compelled to ride over the country among his neighbors, friends and acquaintances and make a fruitless effort to raise money to enable him to pay the charges for which the body of his dead son was unlawfully held in order that he might get possession of it and give it a decent and seasonable burial. A sum that would appear to one exhorbitant might be to another altogether reasonable, or even inadequate, and hence we do not feel disposed to disturb the finding of the jury upon this point.

The judgment is reversed, with instructions to the lower court to enter a judgment upon the first verdict, awarding plaintiff $500 damages.